**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

**JANE DOE,**

**Plaintiff,**

**v.**

**NEW YORK UNIVERSITY,**

**Defendant.**

**Civil Action No. ________**

**COMPLAINT & JURY DEMAND**

Plaintiff Jane Doe[1] ("Plaintiff"), by her attorneys Nesenoff & Miltenberg, LLP, as and for her Complaint against Defendant, New York University ("the University" or "NYU"), alleges as follows:

## THE NATURE OF THE ACTION

1. Plaintiff Jane Doe, a former student at NYU, brings this action for damages against Defendant NYU for violations of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, *et seq*. ("Title IX") stemming from the University's gross mishandling of Plaintiff's report of sexual assault, sexual harassment, intimate partner violence, domestic abuse, and theft and weapons violations against Plaintiff's former roommate, John Smith[2] ("Respondent"), resulting in Plaintiff's subjection to a continued hostile educational environment, harassment, and retaliation. Plaintiff further brings this action for violations of state law stemming from Defendant NYU's failure to abide by its own policies and procedures to Plaintiff's detriment, and intentional infliction of emotional distress and anguish against Plaintiff despite knowledge of actual threats to Plaintiff's physical safety and mental well-being.

[1] Plaintiff is filing a motion to proceed by pseudonym together with this pleading.
[2] Plaintiff herein refers to this student by pseudonym.

2. Specifically, while attending Defendant NYU, Plaintiff was subjected by Respondent to ongoing sexual, physical, and coercive conduct without her consent which persisted until Respondent's arrest in February of 2024. Over the course of the relationship, Respondent subjected Plaintiff to unrelenting physical, sexual, and emotional abuse culminating in Respondent's arrest in February of 2024 for physical assault and false imprisonment.

3. Following Respondent's arrest, Plaintiff reported the abuse she endured at Respondent's hands to Defendant NYU's Office of Equal Opportunity. After initially refusing to take Plaintiff's report roughly three times, Defendant NYU ultimately dragged Plaintiff through an unnecessarily prolonged investigatory and adjudicatory process, all the while permitting Respondent to unashamedly taunt and retaliate against Plaintiff without consequence.

4. Adding insult to injury, Defendant NYU intentionally minimized Respondent's abusive relationship and openly ignored admissions of wrongdoing by Respondent, resulting in little more than a proverbial slap on the wrist for Respondent at the conclusion of the flawed investigation. In reaching its conclusion, Defendant NYU excused or minimized numerous instances of Respondent's dangerous conduct and disregarded key evidence showing Respondent's violations of multiple University policies. Throughout the process, Defendant NYU acted contrary to Plaintiff's rights and best interests and demonstrated a complete disregard for Plaintiff's safety both on campus and within the University community.

5. As a result of Defendant NYU's willful and wanton actions and/or inactions, Plaintiff has suffered tremendous emotional damages which manifested in a myriad of ways and greatly threatened Plaintiff's physical and mental health. Additionally, Plaintiff has incurred and suffered additional damages, including but not limited to, the loss of educational and career opportunities as well as other direct and consequential losses.

## THE PARTIES

6. Plaintiff is a natural person and former student at New York University.

7. During the events described herein, Plaintiff was enrolled as a full-time, tuition-paying undergraduate student at Defendant NYU.

8. Defendant NYU is a private research university in New York City, New York with a principal place of business at 70 Washington Square South, New York, New York.

9. At all times relevant to this Complaint, Defendant NYU received, and continues to receive, federal financial assistance as defined by Title IX of the Education Amendments of 1972 ("Title IX").

10. Accordingly, Defendant NYU is an educational institution subject to liability under Title IX.

## JURISDICTION AND VENUE

11. This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claim arises under the Constitution and statutes of the United States; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

12. This Court has personal jurisdiction over Defendant NYU on the ground that it is conducting business within the State of New York.

13. Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS

### I. Background

14. Plaintiff enrolled as a transfer student at Defendant NYU in the Fall of 2023. Plaintiff graduated from Defendant NYU in May of 2026.

15. On or about August 19, 2023, before the official start of the Fall semester, Plaintiff moved into an apartment off campus in Manhattan. The following day, Plaintiff met one of her new roommates, Respondent, as he was moving into the same apartment.

16. At all times relevant to this Complaint, Respondent was a student at Defendant NYU.

17. Soon after, Respondent sought a relationship with Plaintiff. After Respondent's persistence, Plaintiff engaged in an intimate relationship with Respondent.

18. Respondent soon began exhibiting signs of extreme jealousy and need for control and was not shy to hide his penchant for violence against others.

19. Respondent's desire for power and control over Plaintiff and the relationship quickly and relentlessly worsened, leading to catastrophic consequences for Plaintiff.

### II. Plaintiff Becomes Trapped in a Physically, Emotionally, and Sexually Abusive Relationship with Respondent

20. Throughout the relationship, Respondent insisted on maintaining a high degree of abusive control over Plaintiff.

21. Respondent imposed many requirements on Plaintiff, including his insistence that they engage in sexual intercourse daily against Plaintiff's repeated protestations and verbalizations that the mandate to engage in intercourse at such frequency was against her wishes and causing discomfort.

22. As further example of Respondent's exertion of control over Plaintiff, Respondent

insisted that Plaintiff ask his permission to go to sleep at night. By way of example, but not limitation, on one occasion, Plaintiff sought Respondent's required permission to go to sleep, as opposed to waiting up for him to return to the apartment from being out. Plaintiff was petrified to fall asleep without Respondent's permission as he had previously made clear that such was unacceptable.

23. On that occasion, Respondent ended up returning home, barged into Plaintiff's bedroom, and demanded sex from Plaintiff.

24. While claiming to love Plaintiff, Respondent also took pains to destroy her self-confidence and self-worth in a manipulative effort to keep Plaintiff compliant.

25. Respondent routinely called Plaintiff demeaning names such as "idiot," "whore," "bitch," "stupid," "crazy," and "dirty," and referred to Plaintiff as a "privileged white girl" and "dirty Italian."

26. At the same time, Respondent fed Plaintiff lies to make her believe that he was the only one of their roommates who wanted her to remain living in the apartment, and that if it was not for him, she would have been kicked out and homeless.

27. While living together in the apartment, Respondent made Plaintiff's environment as toxic as he was physically able to do.

28. Respondent created an atmosphere of control within the home by, among other things, withholding Plaintiff's phone, refusing to leave her room, hiding her keys, and blocking her body until she complied with his demands.

29. Respondent would often knock on Plaintiff's bedroom door, call her endlessly at all hours of the night, or jiggle her private bedroom door handle until she opened it in the middle of the night, where he then insisted, against her wishes, to engage in sexual intercourse.

30. Respondent's need for control and jealous tendencies only worsened the longer his relationship with Plaintiff continued and soon, his penchant for violence quickly became targeted towards Plaintiff.

31. On numerous occasions, Respondent, who was physically significantly larger and physically stronger than Plaintiff, violently abused and sexually assaulted Plaintiff.

32. By way of example, but not limitation, in November 2023, after Plaintiff asked Respondent not to slam the door leading to the apartment hallway, Respondent used his body to push Plaintiff. Respondent's body force caused Plaintiff to pivot and caused pain to Plaintiff.

33. By way of further example, but not limitation, on several occasions, Respondent engaged in oral sex with Plaintiff without her consent, penetrated Plaintiff's vagina without her consent, at times while Plaintiff was sleeping, and on at least one occasion, digitally penetrated Plaintiff's anus without her consent.

34. By way of further example, but not limitation, Respondent, without Plaintiff's consent, would lift Plaintiff's shirt and bra to expose and touch her breasts while she was in the apartment's common area and while she was at her desk in her bedroom. This occurred at random times any day or location within the apartment.

35. By way of example, but not limitation, on one occasion, Respondent approached Plaintiff from behind while she was at the kitchen sink washing her hands. At such time, and without Plaintiff's consent, Respondent pulled Plaintiff's top up exposing her breasts. As Plaintiff was in a vulnerable position being approached from behind and with her hands otherwise occupied in the water, she was unable to immediately stop Respondent or otherwise cover herself; Plaintiff was left fully exposed in the common area of the apartment she shared with two other male roommates.

36. In addition, on at least three occasions between November and December 2023, Respondent choked Plaintiff to the point of unconsciousness.

37. On at least one occasion where Respondent choked Plaintiff to the point of unconsciousness, Plaintiff awoke to Respondent having sex with her.

38. Plaintiff made several attempts to leave the relationship with Respondent.

39. On or about January 8, 2024, Plaintiff attempted to end her relationship with Respondent, but he refused to accept or allow the relationship to end.

40. Thereafter, on or about January 11, 2024, Respondent boasted to Plaintiff that he had stolen a knife from a security guard while attending an NYU sanctioned J-term course in Tennessee and sent proof of his criminal activity to Plaintiff over text.

41. Respondent bragged about stealing a "tactical blade" and characterized himself as "dangerous."

42. Respondent went on to state he would "use it" (meaning the knife), which he maintained possession of on Defendant NYU's campus[3], to intimidate Plaintiff into engaging in sexual intercourse against her will while in their apartment.

43. Respondent further stated his plans to conceal the stolen weapon while on campus.

44. Plaintiff, despite her fear, made at least four subsequent attempts to end the relationship to no avail. Each time she told Respondent that their relationship was over, he refused to accept it and manipulated Plaintiff into remaining with him.

45. On or about January 22, 2024, Plaintiff again attempted to break up with Respondent in person when she arrived back in New York after winter break. Respondent refused to accept it.

[3] Upon information and belief, Respondent remains in possession of this weapon on Defendant NYU's campus.

46. Respondent lashed out at Plaintiff; he sent Plaintiff an abusive barrage of text messages and harassed Plaintiff over the phone.

47. Later that evening, Respondent came back to the apartment, upon information and belief under the influence of either drugs, alcohol, or both, and knocked on Plaintiff's bedroom door until she opened it.

48. After Plaintiff opened the door, Respondent forced his way into Plaintiff's room and went on another tirade towards Plaintiff. Respondent falsely told Plaintiff that their other roommates did not like her and did not want to re-sign the lease with her.

49. Respondent again convinced Plaintiff that *he* was her only chance; that if she stayed with him he would convince their roommates to let her stay in the apartment next year.

50. Once again, Respondent manipulated Plaintiff with knowingly false information to keep her trapped within the abusive relationship.

51. Plaintiff, acting out of fear, remained in the relationship in name only. Plaintiff explicitly communicated to Respondent that she did not consent to any further sexual contact of any kind.

52. However, Respondent would not be deterred from fulfilling his sexual desires. Just one day later, on or about January 23, 2024, Respondent sexually assaulted Plaintiff.

53. Plaintiff continued to seek ways to leave and end the relationship with Respondent.

54. Plaintiff began the process of applying for a transfer from Defendant NYU to the University of Southern California ("USC"), an institution on the opposite end of the country and, Plaintiff hoped, far enough away to escape Respondent.

55. Plaintiff was forced to pursue a transfer to USC in secret as she knew that any attempt to leave the relationship with Respondent, if discovered by Respondent, would only lead

to further abuse.

56. Unfortunately, Respondent, through his own deceptive and manipulative means, learned of Plaintiff's application to USC.

57. As Plaintiff feared, when Respondent learned of her intent to transfer schools, his cruel and abusive behavior only worsened. Indeed, Respondent physically assaulted Plaintiff within 48 hours of learning that she had formally submitted her application for transfer to USC.

58. Between January 22, 2024 and the physical assault of Plaintiff on February 18, 2024, described below, Respondent, among other things, (i) repeatedly engaged in sexual acts with Plaintiff without Plaintiff's consent; (ii) physically assaulted Plaintiff causing Plaintiff injuries to her mouth; and (iii) surreptitiously recorded Plaintiff in compromising positions without her consent.

59. None of the sexual contact between Plaintiff and Respondent during this time period was consensual. Indeed, Plaintiff had explicitly told Respondent that she did not want to engage in any sexual contact with him after he refused to accept her attempt to break off their relationship. Plaintiff reiterated her non-consent by telling Respondent "no" when he initiated sexual contact.

60. Despite knowledge of Plaintiff's refusals, Respondent forced Plaintiff to engage in sexual intercourse and other sexual activities with him.

**III. Plaintiff is Finally Able to Escape Her Abusive Relationship and Reports Respondent's Multiple Infractions to Defendant NYU.**

61. On February 18, 2024, after an argument sparked by his jealousy, Respondent grabbed Plaintiff's phone and demanded she unlock it so that he could look through it. When Plaintiff told Respondent he could not look through her phone, Respondent began inputting the wrong code and threatened to keep doing so until Plaintiff's phone became disabled until the

morning.

62. Plaintiff asked Respondent to stop and, when he refused, she began to walk out of her private bedroom. Seeing her attempt to flee, Respondent grabbed Plaintiff from behind and forcefully pulled her back, tightly wrapping his arms around her, and landed them both onto a desk chair.

63. Plaintiff told Respondent to unhand her no less than three times, but he refused and only grabbed her tighter, causing Plaintiff pain. While doing so, Respondent told Plaintiff to be quiet so their roommates could not hear her cries for help.

64. Eventually, Plaintiff was able to break free from Respondent's grasp. By the time she broke free, Plaintiff's arm was red and stinging. Respondent then demanded Plaintiff not tell anyone what happened.

65. Following the attack on February 18, 2024, Plaintiff attempted to report Respondent to Defendant NYU's Office of Equal Opportunity ("OEO"). Plaintiff called OEO approximately three times to report Respondent. Each time, rather than take Plaintiff's report, OEO referred Plaintiff to the police and failed to offer Plaintiff any other support or advise Plaintiff of any other available resources.

66. On or about February 21, 2024, Plaintiff, accompanied by her mother, reported Respondent to the police.

67. Respondent was arrested and formally charged with assault and false imprisonment.

68. Eventually, the OEO accepted a report from Plaintiff against Respondent.

69. In her report to OEO, Plaintiff laid bare the six months of hell her life had become at the hands of Respondent.

70. Finally feeling safe to report the horrors she had been subjected to, Plaintiff reported to Defendant NYU a detailed description of the multiple abuses she had suffered at Respondent's hands, including, but not limited to, (i) repeated instances of sexual assault, exploitation, and abuse; (ii) instances of physical abuse and false imprisonment; (iii) repeated instances of emotional abuse and manipulation; and (iv) a continued threat to Plaintiff's and campus safety posed by Respondent.

71. In response to Plaintiff's OEO report, Defendant NYU commenced a Title IX investigation.

72. Upon information and belief, the purpose of the Title IX investigation was to objectively and fairly evaluate the extent of Respondent's alleged violations of Defendant NYU's relevant policies while simultaneously providing equal support to Plaintiff and Respondent throughout the investigatory and adjudicatory process.

73. Instead, what occurred was nothing short of a travesty. The investigation and adjudication process only served to permit Respondent further opportunity to attack Plaintiff while Defendant NYU re-traumatized her by repeatedly forcing her to describe her experiences with Respondent and defend herself against continuous retaliatory attacks from Respondent.

## IV. Defendant NYU's Title IX Process is Fraught with Bias against Plaintiff and Poorly Veiled Sympathy for Respondent

74. Respondent used Defendant NYU's investigation against him as yet another opportunity to harass, abuse, retaliate and exert control over Plaintiff.

75. Immediately after commencement of the investigation, Respondent, both personally and by and through his then-counsel, sought to embarrass and retaliate against Plaintiff.

76. Respondent employed victim-blaming tactics and strategies to turn Defendant NYU's attention and ire from himself towards Plaintiff.

77. Appallingly, each attempt by Respondent to engage in these behaviors was met with approval by Defendant NYU's investigators and OEO personnel.

78. Several weeks after Plaintiff's original OEO report, Respondent made damning and knowingly false accusations against Plaintiff in a cross-complaint which accused *her* of nonconsensual sexual contact with *him* throughout their relationship.

79. After Respondent filed his cross-complaint against Plaintiff, Defendant NYU intentionally withheld notice of the cross-complaint from Plaintiff.

80. Rather than inform Plaintiff that she was now a respondent in her own Title IX investigation, Defendant NYU chose to keep secret Respondent's allegations against Plaintiff from her, while still treating her as the target of investigation rather than the victim.

81. Indeed, it was not until May 1st, six weeks after Plaintiff's complaint was filed, that Defendant NYU informed Plaintiff that she was now a *respondent* in the ongoing Title IX process.

82. Prior to that notice, Defendant NYU had engaged in several interviews with Plaintiff with the intent of gathering evidence related to *Respondent's* claims without ever notifying Plaintiff that the information being gathered during those meetings was being collected to be used *against her*.

83. After learning of Respondent's cross-complaint, Plaintiff filed another report with Defendant NYU against Respondent for retaliation.

84. Only a cursory review of Respondent's cross-complaint was sufficient to see the allegations for what they truly were—a blatantly retaliatory attack on Plaintiff for filing her good faith report of intimate partner violence, sexual assault and domestic abuse.

85. Indeed, Respondent could not even find it in himself to support his own false accusations.

86. Respondent clearly stated during his initial interview with the investigators that *all* sexual touching between the two parties was consensual. This claim was obviously incompatible with his decision to file claims against Plaintiff that she had engaged in any nonconsensual sexual contact with him.

87. Despite clear evidence that Respondent's cross-complaint was an abuse of Defendant NYU's investigatory process aimed to further harm and victimize Plaintiff, Defendant NYU appallingly permitted the cross-complaint to proceed to a hearing.

88. During the investigation, Defendant NYU repeatedly showed preferential treatment towards Respondent, and allowed him to inundate the investigators, and later decision maker, with irrelevant information and alleged "evidence" in support of his defense which amounted to nothing more than further defamatory attacks against Plaintiff.

89. By way of example, but not limitation, Defendant NYU permitted Respondent to inundate the investigators with verifiably false stories about Plaintiff and her family and mental health and accused Plaintiff of lying about her diagnosis of Post-Traumatic Stress Disorder.

90. Respondent, along with his counsel, viciously attacked Plaintiff's character; they called her racist and classist without any basis in fact, and spewed lies about Plaintiff's prior sexual experience in an effort to paint her as some sort of promiscuous aggressor in his and Plaintiff's relationship.

91. Defendant NYU accepted and endorsed Respondent's gross mischaracterization of Plaintiff and her character, despite possessing clear evidence to the contrary. Indeed, Defendant NYU had written admissions from Respondent as to his own sexual history and assertion that he would intentionally lie to get what he wanted.

92. Respondent also submitted multiple documents which were, upon information and

belief, at least in part drafted and prepared by his counsel, which sought to subjectively interpret his text message communications, many of which supported Plaintiff's report and negated Respondent's accusations.

93. These improper and unlawful submissions included, but were not limited to, unredacted photographs of Plaintiff in compromising positions which were taken and shared without Plaintiff's knowledge or consent.

94. Respondent's submissions materially altered communications to and/or from himself and Plaintiff. The altered communications, which were improperly annotated by Respondent and his counsel, made further false accusations against Plaintiff. In addition, the submissions intentionally removed relevant entries and communications from evidence, and appallingly added fabricated communications which never took place.

95. Defendant NYU had access to, per its own admission, a complete, unannotated, and unaltered copy of the communications submitted by Respondent. Despite this, Defendant NYU chose to wholesale accept the fabricated evidence from Respondent to Plaintiff's detriment.

96. Defendant NYU's acceptance of these materials was strictly prohibited by Defendant NYU's own policies, which mandated that all irrelevant, false, or misleading information must be kept out of the investigatory process.

97. Defendant NYU's acceptance of these materials was also prohibited by a separate Defendant NYU policy, which mandated that all participation and submissions related to the Title IX investigation must come from the participants. Respondent's submissions were clearly drafted by counsel, a point duly raised by Plaintiff during the Title IX process which Defendant NYU never responded to or addressed.

98. Still, Defendant NYU accepted the false, misleading, and irrelevant information

from Respondent and his counsel. The record was never corrected by NYU and there was no admonishment or consequence for their actions.

99. In addition to submitting a barrage of defamatory and irrelevant information as evidence against Plaintiff, Respondent repeatedly lied to investigators throughout his interviews and tried to minimize the significant key evidence demonstrating his responsibility for intimate partner violence against Plaintiff.

100. By way of example, but not limitation, Respondent committed the following offenses during the investigative process:

a. Respondent weaponized Plaintiff's age by advancing the false narrative that, because she was a few years older, Plaintiff had taken sexual advantage of him. This assertion stands in stark contrast to Respondent's own behavior: he repeatedly boasted to Plaintiff about his alleged sexual experience and admitted under cross-examination that he exaggerated and lied about such claims in order to impress her.

b. Respondent falsely reported to investigators that Plaintiff cheated on him—an allegation that investigators accepted as true and then used to undermine Plaintiff's credibility. This claim was directly refuted by Plaintiff's own statements and by the original communications Defendant NYU had in its possession, which plainly disproved Respondent's accusations. Nevertheless, Defendant NYU intentionally disregarded this evidence and accepted Respondent's false narrative.

c. Respondent tried to minimize texts which revealed the control he exerted over Plaintiff. By way of example, in reference to a text message where Plaintiff was forced to ask for permission to go to sleep before Respondent returned to their shared apartment, Respondent stated that the text was irrelevant because he did give Plaintiff permission to sleep on her own on the night in question. As with many of Respondent's representations during the investigation, this proved to be false. In reality, Respondent came home drunk that night, barged into Plaintiff's room while she was sleeping and demanded sex.

101. Respondent's statements were easily disproved by text message and other readily available documentary evidence.

102. Still, Defendant NYU treated his statements as gospel and, despite documentary evidence eviscerating his credibility, to Plaintiff's detriment, the University ultimately found Respondent equally as credible as Plaintiff, if not more so.

103. Upon information and belief, emboldened by Defendant NYU's readiness to credit virtually any allegation he made, and acting with malicious intent to inflict maximum harm on Plaintiff, Respondent intentionally waited until nearly six months into the investigation, after the evidence had been established, before submitting un-redacted nude photographs of Plaintiff.

104. Respondent had deliberately retained these pictures of Plaintiff, taken without Plaintiff's knowledge or consent, and intentionally waited to introduce them at the moment it would cause the most trauma to Plaintiff.

105. The nude photographs were taken during the abusive relationship between Respondent and Plaintiff, without Plaintiff's informed consent. The photographs clearly showed Plaintiff in a state of severe intoxication on the night of December 21, 2023, the same night Respondent digitally penetrated Plaintiff's anus without her consent.

106. The submission of the photographs was, on its face, a further violation of Defendant NYU's policies which prohibited from consideration the "prior sexual history of the Complainant" in any character or reputation determination.

107. Moreover, the taking and possession of the photographs were a violation of Defendant NYU's policy prohibiting sexual exploitation, which, among other things, prohibited the dissemination, streaming, or posting of pictures of another person in a state of undress or of a sexual nature without consent.

108. Respondent stated in the hearing that he could not recall if he ever showed Plaintiff the photos and that she knew they were *for his consumption* stored in his "MY EYES ONLY" folder in Snapchat.

109. Indeed, Respondent had never shown Plaintiff these photos prior to the Title IX investigation. Even worse, Defendant NYU never gave Plaintiff any notice that Respondent had

submitted the photos as part of the investigation; the first time Plaintiff became aware of them was during her review of the investigative report.

110. Despite Defendant NYU's own policy and Respondent's admissions, the nude photographs were accepted by the investigators, became part of the evidence for consideration in the investigation over Plaintiff's objections, and considered by the decision maker in rendering a finding on Respondent's responsibility.

111. Indeed, during the hearing, Defendant NYU's adjudicator permitted Respondent's counsel to manipulate the photographs and zoom in on the pictures in a clear attempt to humiliate and further victimize Plaintiff.

112. Not only did Defendant NYU accept as evidence the sexually exploitative photographs, it also failed to conduct even a surface-level inquiry, let alone appropriate investigation, into Respondent's further violation of policy for having taken and possessed the photos to begin with.

113. Instead, Defendant NYU again showed favoritism towards Respondent and a disgusting indifference towards Plaintiff by accepting Respondent's inappropriate 'evidence' against Plaintiff and turning a blind eye to clear proof of his repeated violations of University policy.

114. The photographs were not the only clear evidence of Respondent's policy violations that Defendant NYU intentionally ignored, to the detriment of not only Plaintiff but the safety of the entire student body.

115. In her initial OEO report, and as discussed at numerous points during the investigation, Respondent had intentionally and admittedly stolen a knife from a security guard while in Tennessee taking a course during Defendant NYU's J-term.

116. Respondent even laughed about his criminal act and called himself "dangerous."

117. Indeed, documentary evidence submitted during the investigation demonstrated that Respondent (i) had stolen the knife; (ii) bragged about being dangerous; (iii) continued to possess the knife on campus hiding in either his bag or sock; and (iv) used the knife as a means to threaten and intimidate Plaintiff by stating he would "use it."

118. Respondent's act of stealing the knife and stating he would use it violated not only Defendant NYU's policies, namely the University's Weapons Policy and Code of Conduct, but also New York and Tennessee criminal laws.

119. Despite this, Defendant NYU chose *not* to pursue any investigation or action against Respondent for his admitted "act of thievery" or continued possession and concealment of the knife.

120. Instead, Defendant NYU minimized the impact the knife had on Plaintiff and wholesale credited Respondent's version of events that he had merely "found" the tactical knife.

**V. Defendant NYU Repeatedly Disregards Plaintiff's Credible Fears for Her Safety on Campus and Fails to Provide any Reasonable Supportive Measures to Her**

121. Throughout the investigation, Plaintiff made clear her very real and reasonable fear of being on campus with her armed abuser.

122. Rather than step in to assuage Plaintiff's fears, Defendant NYU disregarded its own policies and allowed Plaintiff to remain in an unsafe and hostile environment, leading to a further deterioration of Plaintiff's mental and emotional well-being.

123. By way of example, but not limitation, following revelation of Respondent's possession of a dangerous weapon, namely the stolen tactical knife, Defendant NYU had the authority, if not the outright duty, to remove the threat Respondent posed to Plaintiff and others on campus by imposing Respondent's emergency removal from campus.

124. Rather than do this or even perform the necessary risk assessment to determine whether an emergency removal was appropriate, Defendant NYU chose instead to knowingly permit an armed assailant accused of multiple acts of physical and sexual violence to remain on campus.

125. Not only did Defendant NYU fail to take any action against Respondent, but the University also further denied Plaintiff's requests for reasonable supportive measures which, per University policy, were available to her and appropriate under the circumstances.

126. Specifically, on September 5, 2024 and again on November 5, 2024, Plaintiff requested to have a campus escort walk with her to her classes – something Defendant NYU specifically advertises as a supportive measure available to students under its Sexual Misconduct, Relationship Violence, and Stalking Policy. (*See https://www.nyu.edu/about/policies-guidelines-compliance/policies-and-guidelines/sexual-misconduct--relationship-violence--and-stalking-policy.html* (last accessed 12/17/2025)).

127. Plaintiff's request was motivated by her credible fear of further retaliation and retribution from Respondent. At the time of Plaintiff's requests for an escort, Respondent knew where Plaintiff lived, had admitted to possessing a dangerous weapon on campus, had made plans on ways to conceal the dangerous weapon on his person, and had been unapologetically physically and sexually violent towards Plaintiff.

128. In addition, Respondent had acted menacingly towards Plaintiff when he saw her on campus during the pendency of the investigation.

129. Plaintiff's request for a campus escort to her classes was reasonable under the circumstances and was within Defendant NYU's authority to grant and provide the requested escort.

130. Still, Defendant NYU denied Plaintiff's requests, again leaving Plaintiff to fend for herself against a known threat to her safety on campus.

## VI. Despite Overwhelming and Incontrovertible Evidence of Respondent's Responsibility for Multiple Policy Violations and Continued Threat to Campus Safety, Defendant NYU Lets Him Off with a Proverbial Slap on the Wrist

131. Following the investigative phase of the process, Defendant NYU employed a supposedly neutral adjudicator to preside over the subsequent hearing and make a determination of responsibility.

132. The adjudicator hired by the University proved just as biased and inept at objectively weighing the evidence as the investigators were.

133. The adjudicator issued a written decision (the "Decision") which concluded that Respondent was responsible for only one infraction, the physical assault against Plaintiff on February 18, 2024 which he was arrested for in February 2024. Respondent was found not responsible for retaliation and Plaintiff was accused of failing to provide sufficient evidence of Respondent's retaliation during the investigation.

134. To find largely in Respondent's favor, the adjudicator made several clear errors and, upon information and belief, intentional misrepresentations of the evidence and facts. A non-exhaustive list of such errors includes:

a. Misrepresentation of Plaintiff's clear and specific hearing testimony which detailed the instances wherein Respondent touched her breasts without consent. Instead of crediting Plaintiff's detailed testimony, the adjudicator chose to accuse Plaintiff of "vagueness" and credited Respondent's unsupported testimony that it was understood that he did not have to seek permission to touch Plaintiff as he pleased;

b. Ignorance of Respondent's admission that he brushed past Plaintiff causing her to pivot and made insignificant contact with her and disregard for Plaintiff's testimony regarding this incident in favor of implanting the adjudicator's own opinion as to what could have *possibly* occurred, even when the evidence did not fit that narrative; and

c. Misrepresentation, in the investigative materials and final determination, that it was "undisputed" that Respondent "found" or "acquired" or "owned" rather than ***stole*** the knife despite Plaintiff's testimony and documentary evidence contradicting this narrative, including Respondent's own statements.

135. Moreover, the adjudicator completely ignored key pieces of evidence collected during the investigation, and improperly weighed Respondent's credibility as equal to Plaintiff's.

136. By way of example, but not limitation, the adjudicator, among other things:

a. Failed to correct the record to demonstrate Respondent's clear admissions of stealing the tactical knife in favor of finding that Respondent merely "acquired" the knife through lawful means;

b. Ignored admissions by Respondent that he would comfortably lie in order to serve his own interests;

c. Accepted Respondent's biased and untrue characterization of Plaintiff and their relationship in order to depict Respondent as naïve and the victim of Plaintiff's experience;

d. Ignored Respondent's admission under cross-examination that he used ultimatums to manipulate Plaintiff;

e. Ignored Respondent's admission that he had talked to Plaintiff "a few times about the condom thing," disregarded Plaintiff's repeated requests that he use a condom because "he didn't want to use one", and intentionally omitted Respondent's admissions in its investigative materials and finding determination;

f. Accepted Respondent's explanation that his act of touching Plaintiff, even when knowingly without her consent, was acceptable because of their "dynamic" and "an understood course of action," since they were in a relationship;

g. Ignored Respondent's clearly contradictory positions that (i) all contact between himself and Plaintiff was consensual due to the nature of their relationship but that (ii) the basis of his retaliatory cross-complaint was that Plaintiff's contact with him was non-consensual;

h. Interpreted select messages between Plaintiff and Respondent that could be read to show consent to *some* instances of sexual contact as evidence of Plaintiff's consent to *all* sexual contact at any time with Respondent;

i. Penalized Plaintiff for failing to produce documentary evidence of abuse and nonconsensual contact, and finding without basis that any example of consent by Plaintiff—as determined solely by the adjudicator—equated to consent for *all*

actions and contact between Plaintiff and Respondent; and

j. Punished Plaintiff for failing to demonstrate through documentary evidence every instance of abuse by Respondent.

137. Moreover, where the adjudicator could not simply massage the evidence to fit his intended result in favor of Respondent, the adjudicator merely found Respondent not responsible without explanation.

138. Specifically, for five of the policy violations alleged against Respondent, specifically allegations 5-8 and allegation 10, the adjudicator found for Respondent without detailing the basis for such finding in his Decision.

139. By excluding any specific basis for his findings, the adjudicator stripped Plaintiff of her ability to appeal his finding and the supporting reasons for it.

140. Furthermore, the adjudicator's determination made clear that he was not trained in, or at the very least did not properly apply, the dynamics of Intimate Partner Violence ("IPV") to his analysis of Plaintiff's case.

141. It is well established that victims of IPV engage in appeasement behaviors toward their abusers as a survival mechanism, often in an effort to prevent or at least minimize future instances of abuse.

142. This dynamic can result in communications or interactions that, when viewed without proper context or understanding of IPV, may appear inconsistent with victimization or may be misinterpreted as evidence of a consensual or affectionate relationship.

143. Displaying a breathtaking lack of understanding for this well-documented and accepted behavioral pattern, the adjudicator placed a heightened burden on Plaintiff to prove she suffered abuse from Respondent.

144. The adjudicator cherry-picked select, out-of-context, and seemingly affectionate

text message exchanges between Plaintiff and Respondent to discredit Plaintiff's allegations of abuse, and ignored Respondent's own admissions that he engaged in intimate partner violence, including testimony elicited by Respondent's counsel that Respondent had choked Plaintiff more times than he could count.

145. The adjudicator, in essence, punished Plaintiff for not being able to produce a text message communication that unequivocally proved she was the victim of abuse by using the lack of such 'unicorn' evidence as the basis to rule in favor of Respondent.

146. The adjudicator's emphasis on the text messages, rather than a holistic view of all the evidence, including Plaintiff's consistent testimony as to the abuse she suffered, further resulted in negative consequences for Plaintiff.

147. The adjudicator showed an obvious bias against Plaintiff in his interpretation of the text messages. He chose to emphasize the select messages where the adjudicator interpreted Plaintiff as expressing a desire to engage in sexual contact on select occasions and concluded that those limited communications amounted to a blanket consent to all sexual activity with Respondent at any time.

148. Notably, the messages relied upon by the adjudicator to discredit Plaintiff's allegations were related to instances where Plaintiff was either clearly intoxicated as evidenced by the messages themselves or located in a completely different state than Respondent.

149. Moreover, the adjudicator did not place the same burden of proof on Respondent when evaluating the text message evidence. Where Plaintiff was penalized for not supporting her allegations of abuse with text message evidence, Respondent's numerous falsehoods submitted in his defense of Plaintiff's allegations were readily accepted without any evidentiary support.

150. By way of example, but not limitation, Respondent alleged to Defendant NYU that

Plaintiff liked to engage in sexual "knife play" as a means to skirt responsibility for his theft and possession of the weapon.

151. Specifically, throughout the investigative process, Respondent submitted no less than three different stories regarding the use of the knife.

152. Respondent initially claimed that Plaintiff had asked him to engage in knife play but he declined. Respondent then stated that he and Plaintiff did engage in knife play on occasion. Next, Respondent claimed that he could not recall if he ever showed Plaintiff the knife.

153. None of Respondent's shifting narratives were true. Plaintiff consistently and unquestionably denied Respondent's claims of "knife play" during their sexual encounters.

154. Despite Plaintiff's denials and the fact that Respondent submitted no evidence to support his claim that knife play ever happened, the adjudicator advanced Respondent's fabricated account through the hearing process.

155. Contrary to how Plaintiff was treated, the adjudicator never penalized Respondent for failing to submit evidence of his claims. Rather, Respondent's claims were accepted without any resistance or vetting from Defendant NYU.

156. Moreover, in his determination, the adjudicator utterly failed to provide any factual basis or policy analysis for his decision to find Respondent not responsible for the four allegations of sexual assault against Plaintiff, thereby depriving Plaintiff of any information as to why the adjudicator ruled against her and hindering her ability to challenge the determination in her right to appeal.

157. As a result of the biased and improper investigation into Plaintiff's claims, coupled with the adjudicator's unqualified analysis of the evidence in Respondent's favor, Respondent was able to walk away from the investigation with a proverbial slap on the wrist which only

emboldened him further.

158. Respondent was shockingly and absurdly found responsible for just *one* of the allegations against him by Plaintiff despite ample evidence of his responsibility for *all* of the allegations in Plaintiff's report, including multiple instances of sexual violence.

159. After all the abuse Respondent subjected Plaintiff to, his sanction was a mere one-semester suspension, an extremely lenient punishment given the breadth of the harm he caused Plaintiff and the clear evidence Defendant NYU had of same.

160. Plaintiff filed an appeal of the Decision on grounds of procedural irregularity, bias against her affecting the outcome, and a disproportionate sanction.

161. The appeal panel, however, affirmed the adjudicator's decision.

162. Specifically, the appeal panel found no indication of procedural irregularity in applying the "preponderance of evidence" standard, found no evidence to substantiate claims of bias, and did not find the one-semester suspension to be disproportionate, noting it is "not an atypical punishment for violations of this nature and severity."

163. Notably, Defendant NYU has expelled students for far less violent and/or threatening alleged infractions following disciplinary proceedings and appeal, such as (i) the rifling through a public safety officer's unattended wallet (*See Johnson v. New York University*, 324 F.R.D. 65, 67 (S.D.N.Y. 2018)) and (ii) glancing at another student's test paper during an exam (*See Flores v. New York University*, 79 A.D.3d 502, 503 (1st Dept 2010)).

164. Rather, the appeal panel accused and blamed Plaintiff of trying to reexamine credibility determinations and reargue the evidence.

165. Even after the appeal process was completed, and a final determination largely in Respondent's favor was reached, Defendant NYU continued (and continues to date) to act to

Plaintiff's detriment.

166. By way of example, but not limitation, Defendant NYU implemented and up to Plaintiff's graduation in May of 2026, continued to enforce a mutual no contact order ("NCO") which required Plaintiff to refrain from being near Respondent or face disciplinary action.

167. Although Plaintiff had no intention of being voluntarily near Respondent again, the mere act of restraining a victim's movements and freedoms in an academic setting only served to re-victimize Plaintiff.

168. Rather than impose restrictions solely on the adjudicated perpetrator, Respondent, the mutual NCO placed the onus on Plaintiff to keep herself safe.

169. The mutual NCO gave Respondent grounds to lodge even more unfounded and untruthful allegations against Plaintiff.

170. By way of further example, but not limitation, Defendant NYU has, upon information and belief, taken no action to address the continuing safety threat Respondent poses to Plaintiff and the entire campus community.

171. Indeed, throughout the investigation, adjudication, and appeal, Respondent openly admitted to stealing a dangerous weapon (the tactical knife) and admitted to continuing to possess it on campus. He further repeatedly referred to himself as a "danger" and/or "dangerous."

172. Despite this, and despite Plaintiff's repeated pleas that action be taken to address the risk and clear policy violations being committed by Respondent, no steps by Defendant NYU have been taken to address the matter.

## VII. Plaintiff is Left to Pick Up the Pieces

173. As expected, Plaintiff suffered emotionally as a result of the abuse she suffered during her relationship with Respondent.

174. However, Plaintiff did not, and arguably could not, have expected how much the University's gross mishandling of her OEO report would exacerbate and compound upon her already vulnerable emotional and physical well-being.

175. Plaintiff could not have imagined that the consequences for seeking help and reporting what she had experienced would be so severe.

176. The trauma of Plaintiff's experience through the Title IX process at Defendant NYU has seeped into every part of her life.

177. As a result of Defendant NYU's actions and/or inactions, Plaintiff has been diagnosed with post-traumatic stress disorder (PTSD) and undergoes weekly, trauma-focused psychotherapy treatment.

178. Due to the fear of running into Respondent, and the continued retaliation he engaged in following her OEO report, Plaintiff lived in persistent fear of running into Respondent on campus, leading to a negative impact on Plaintiff's educational experience and academics for the remainder of Plaintiff's enrollment at Defendant NYU.

179. Plaintiff found it increasingly difficult to focus on her classes which negatively affected her academic performance and, by extension, her career and professional trajectory.

180. In addition, Plaintiff's social and extra-curricular life deteriorated as she often stayed away from public spaces out of fear of further retaliation from Respondent.

181. During her senior year at the University, Plaintiff was forced to drop a course due to being afraid of running into Respondent at the University's Bobst Library, which eliminated Plaintiff's chances and reasonable expectation of graduating early from Defendant NYU.

182. Plaintiff graduated from Defendant NYU in May of 2026.

183. In addition to the physical, emotional, and mental toll this ordeal has brought on

Plaintiff, Plaintiff has also suffered concrete setbacks to her academic and professional progression.

184. Namely, as a result of Defendant NYU's insistence to proceed with a full investigation and hearing on Respondent's retaliatory cross-complaint, Plaintiff lost the opportunity to enroll in USC, where she had been accepted as a transfer student.

185. Moreover, the trauma caused by her experience at Defendant NYU has limited Plaintiff's professional opportunities.

## CAUSES OF ACTION

### COUNT I
### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.
### Deliberate Indifference

186. Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

187. Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

188. Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding.

189. Defendant NYU receives federal funding.

190. Title IX is enforceable through a private right of action.

191. Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student… complaints alleging any action

which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).

192. The failure of a university to promptly and adequately address complaints of sexual assault and/or harassment amounts to "deliberate indifference" for which Defendant NYU may be held liable under Title IX.

193. Defendant NYU acted with deliberate indifference to known acts of sexual harassment, sexual assault, and/or intimate partner violence in its substandard investigation and adjudication of Plaintiff's OEO complaint and its refusal to investigate subsequent evidence of continued harassment and retaliation against Plaintiff.

194. Defendant NYU's actions constitute deliberate indifference as its inadequate investigation and remedies to Plaintiff's complaints were clearly unreasonable in light of the known circumstances, including the gravity of the allegations and the severity and pervasiveness of the alleged misconduct.

195. Defendant NYU's failure to promptly and adequately respond to Plaintiff's complaint of sexual harassment, sexual assault, and/or intimate partner violence against Respondent and evidence of further violations of the University's policies by Respondent subjected Plaintiff to further harassment and retaliation, as well as a sexually hostile environment, which was so severe, pervasive, and objectively offensive that it effectively denied Plaintiff access to educational opportunities at Defendant NYU.

196. As a direct and proximate result of Defendant NYU's deliberate indifference to Plaintiff's complaints, Plaintiff was subjected to a hostile educational environment while attempting to pursue her education on Defendant NYU's campus.

197. As a direct and proximate result of Defendant NYU's deliberate indifference to Plaintiff's complaints in violation of Title IX, Plaintiff was deprived of her access to educational opportunities as she was, *inter alia*, unable to adequately focus on her studies in light of continuing sexual harassment, retaliation, and a hostile environment that Defendant NYU refused to remedy. As a result, Plaintiff's grades and on-campus life were, and continue to be, negatively impacted.

198. As a direct and proximate result of Defendant NYU's deliberate indifference to Plaintiff's complaints, Plaintiff has suffered and continues to suffer significant, severe, and ongoing emotional distress and mental anguish.

199. In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT II**
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.**
**Selective Enforcement**

200. Plaintiff realleges and incorporates by reference the factual allegations contained herein.

201. Title IX of the Education Amendments of 1972 ("Title IX") provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

202. Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendant NYU.

203. Title IX may be violated by a school's failure to prevent or remedy sexual

harassment or sexual assault, or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.

204. Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (emphasis added).

205. The "prompt and equitable" procedures that a school must implement include, at a minimum:

a. "Notice . . . of the procedure, including where complaints may be filed";

b. "Application of the procedure to complaints alleging [sexual] harassment...";

c. "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

d. "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

e. "Notice to the parties of the outcome of the complaint….." *See generally* U.S. Dep't of Education, Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX (2001) at 20.

206. Based on the foregoing, Defendant NYU failed to conduct an adequate, reliable, and impartial Title IX Investigation, and treated Plaintiff less well than the similarly situated male participant to the investigation, Respondent.

207. Specifically, as described in detail above and herein, Defendant NYU, among other things:

a. Failed to provide Plaintiff with the required notice, rights, and safeguards afforded to respondents under Title IX and Defendant NYU's policies after receipt of Respondent's cross-complaint. Rather, Defendant NYU intentionally withheld notice and knowledge of the cross-complaint from Plaintiff in favor of using her

interview as a means to gather evidence against her.

b. Repeatedly permitted Respondent to circumvent the rules and procedures promulgated under Defendant NYU's policies to further harass, humiliate, and retaliate against Plaintiff during the Title IX investigation and hearing.

c. Defendant NYU insisted on pursuing an investigation against Plaintiff despite evidence that Respondent's allegations were false and retaliatory.

d. Defendant NYU showed a favor for Respondent and permitted him several leniencies in the Title IX interview, complaint, and hearing process, which permitted Respondent's allegations to be grossly exaggerated causing exponentially more harm to Plaintiff's reputation and well-being.

e. Defendant NYU's officers and agents, including and especially the assigned investigators and hearing officer, presented a skewed version of the facts underlying Respondent's defense and allegations against Plaintiff which improperly favored Respondent and a finding against Plaintiff.

208. Discrimination under Title IX may be inferred where, among other things:

a. A university fails to act in accordance with its procedures designed to protect accused students;

b. A university fails to seek out potential witnesses whom the accused had identified as sources of information favorable to the accused;

c. A university has previously been criticized for not seriously addressing complaints of sexual misconduct; and

d. A university made factual findings against the accused that were incorrect and contrary to the weight of the evidence.

209. Particular circumstances suggest that gender bias was a motivating factor behind the selective enforcement of the protections within the Policy. These circumstances include, *inter alia*:

a. Defendant NYU showed a favor for Respondent and permitted him several leniencies in the Title IX interview, complaint, and hearing process, which permitted Respondent's allegations to be grossly exaggerated causing exponentially more harm to Plaintiff's reputation and well-being. He said ALL was consensual. Then made her the abuser.

b. The investigators and hearing officer presented a skewed version of the facts and wholesale accepted the male Respondent's statements as fact despite evidence

conclusively demonstrating their falsity, and used said statements as a means to find against Respondent not responsible for the majority of Plaintiff's allegations against him.

c. Defendant NYU treated Plaintiff, the female complainant, differently than Respondent, the male respondent, including, without limitation, by accepting and considering evidence otherwise impermissible under Defendant NYU's policies and permitting Respondent to present false evidence prepared by his advisor and counsel.

d. Defendant NYU reached a final decision that was directly at odds with the preponderance of reliable and credible evidence it had before it.

e. Defendant NYU further imposed an unjustly lenient penalty on Respondent.

210. As a direct and proximate result of Defendant NYU's unlawful conduct, Plaintiff has suffered and continues to suffer significant, severe, and ongoing emotional distress and mental anguish.

211. In light of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, loss of educational and career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT III**
**Breach of Contract**

212. Plaintiff realleges and incorporates by reference the factual allegations contained herein.

213. At all times relevant, Defendant NYU by and through its various policies and procedures, including, but not limited to, its Sexual Misconduct Policy[4] (the "SMP"), its procedures for Reporting, Investigation, and Resolving Sexual Misconduct, Relationship Violence, and Stalking Complaints Against Students (the "SM Procedures"), its Weapons and

[4] Upon information and belief, Defendant NYU's Sexual Misconduct Policy is known as the "Reporting, Investigating, and Resolving Sexual Misconduct, Relationship Violence, and Stalking-Complaints Against Students" policy.

Simulated Weapons Policy (the "Weapons Policy"), and its Conduct Policy (the "Code of Conduct"), created binding express and/or implied-in-fact contracts with its students, including Plaintiff. *See Monaco v. N.Y. Univ.,* 204 A.D.3d 511, 516, 164 N.Y.S.3d 87, 90 (1st Dep't 2022).

214. These contracts included, among other things, specific, mandatory procedural guarantees.

215. By accepting federal funding and enrolling students, including Plaintiff, Defendant NYU made specific representations regarding the procedures it *must follow* during disciplinary and sexual misconduct investigations.

216. Plaintiff applied to and enrolled in the University and paid associated fees and expenses for her enrollment.

217. Plaintiff did so in reliance on the understanding and with the reasonable expectation that the University would implement and enforce the provisions and policies set forth in its official publications, including, among other things, Defendant NYU's SMP, the Weapons Policy, and the Code of Conduct.

218. Based on the aforementioned facts and circumstances, Defendant NYU breached its express and/or implied agreement(s) with Plaintiff during the Title IX investigation and hearing process, and thereafter.

**I. Title IX Investigation and Adjudication**

**a. The University's SMP and SM Procedures**

219. At the time of Plaintiff's Title IX complaint (February 2024) and through the duration of the Title IX investigation, hearing, and appeal, Defendant NYU maintained an SMP, upon information and belief dated and effective since October 2021 (the "2021 SMP").

220. The 2021 SMP provided for the applicable process and procedure for the investigation and adjudication of Title IX related complaints.

221. The 2021 SMP applied to complaints of, among other things, sexual assault, dating violence, domestic violence, and sexual exploitation. According to the SMP, such actions "undermine the character and purpose" of the University and would not be tolerated.

222. The 2021 SMP defined these actions as follows:

a. Sexual Assault: having or attempting to have sexual contact with another individual without consent or where the individual cannot consent because … incapacitation.

b. Dating Violence: any act committed by a person who is or has been in a social relationship of a romantic or intimate nature with the Complainant.

c. Sexual Exploitation: specific forms of sexual misconduct that involve(s) non-consensual use of another individual's nudity or sexuality or taking advantage of another person's sexuality without affirmative consent. This may include the taking and/or disseminating of pictures and/or videos of another person engaging in a sexual act or in a state of undress without the individual's knowledge and consent.

223. Plaintiff's Title IX complaint fell within the jurisdiction of the 2021 SMP. Accordingly, Defendant NYU was required to investigate and adjudicate Plaintiff's report pursuant to the then-effective SM Procedures, dated and effective April 18, 2022 (the "2022 SM Procedures").

224. Upon receipt of a Title IX report, the 2022 SM Procedures mandated that NYU take "immediate and appropriate steps to respond to the report and work to resolve the matter promptly and equitably."

225. Following submission of a report, the 2022 SM Procedures mandated that the Title IX Coordinator perform an initial assessment to determine whether the reported conduct amounts to a policy violation and what, if any, additional steps are necessary.

226. As part of this initial assessment, the Title IX Coordinator must "conduct an individualized analysis of safety and risk for the campus community to determine whether a Respondent's presence … poses an immediate threat to the physical health or safety of any student or other individual that justifies removal."

227. The 2022 SM Procedures further provided specific procedural investigative and adjudicative steps to be taken in response to a Title IX related report of misconduct, including, but not limited to,

a. Following receipt of a Title IX report and initiation of an investigation, the Title IX Coordinator will designate an investigator(s) to conduct a "prompt, thorough, equitable, and impartial" investigation. The investigator shall have no actual bias or conflict of interest for or against either party.

b. All parties to the investigation were required to receive a notice of investigation at the commencement of the investigation, which shall be amended and/or supplemented should the investigation reveal the existence of additional or different potential violations of the 2021 SMP or 2022 SM Procedures.

c. The 2022 SM Procedures permitted each party to the investigation an "equal opportunity to participate in the investigation, to submit information and corroborating evidence, to identify witnesses who may have relevant information, to be accompanied by an advisor of choice to any meeting, to timely and equal access to information that will be used in disciplinary meetings and proceedings, and to timely notice of meetings at which their presence will be requested or required."

d. The 2022 SM Procedures further made clear that the prior sexual history of the parties to the investigation will not be considered unless under select and specific circumstances. The 2022 SM Procedures further noted that "[e]ven in the context of a relationship, consent on one occasion does not constitute consent on a subsequent occasion."

e. The 2022 SM Procedures further permitted each party to have an equal opportunity to inspect and review all evidence obtained as part of the investigation including evidence which the University does not intend to rely upon, including the opportunity to review and comment on the investigator's report of the evidence.

228. Following the investigation, the 2022 SM Procedures provided that a hearing would be held and thereafter a determination made by the adjudicator following careful review and consideration of all the evidence.

229. During the hearing, the 2022 SM Procedures permitted each party to have an advisor to question witnesses. However, the advisor was permitted only to ask relevant questions, could not submit his/her/their own evidence, and was required to "comport themselves in a manner that is not disruptive to the hearing."

230. Pursuant to the 2021 SMP, during the investigative and adjudicative process, complainants to an investigation are entitled to "reasonably available supportive measures," including, but not limited to, "campus escort services," academic and mental health supports, and "increased security and monitoring of certain areas of campus."

231. Further, all participants to an investigation under the 2021 SMP were required to provide "truthful information" and warned that "[s]ubmitting or providing false or misleading information in bad faith or with a view to personal gain or intentional harm to another … is prohibited and subject to disciplinary sanction."

**b. Defendant NYU's Breaches of the 2021 SMP and 2022 SM Procedures**

232. As set forth herein and above, Defendant NYU failed miserably in upholding its procedural guarantees, as codified in the 2021 SMP and 2022 SM Procedures, during the investigation and adjudication of Plaintiff's Title IX Complaint and Respondent's cross-complaint.

233. A non-exhaustive list of Defendant NYU's breaches includes the following:

a. Defendant NYU failed to issue Plaintiff an accurate and timely notice of investigation outlining the retaliatory cross-claim submitted by Respondent during the investigation, opting instead to sandbag Plaintiff with questions regarding the cross-claim before permitting Plaintiff notice of the claims against her;

b. Defendant NYU failed to objectively collect, review, and consider all relevant evidence in support of Plaintiff's defense against Respondent's retaliatory allegations and/or in support of Plaintiff's initial report;

c. Defendant NYU showed a favor for Respondent and permitted Respondent several leniencies in the Title IX investigative and hearing process, including permitting Respondent to belatedly submit evidence (nude photographs of Plaintiff) which violated Defendant NYU's 2021 SMP without consequence, and permitting Respondent's advisor to harass Plaintiff during the investigation and subsequent hearing;

d. Defendant NYU presented a skewed version of the facts underlying Plaintiff's allegations and Respondent's cross-claim with the intent to minimize Respondent's responsibility and ultimately find in his favor against the weight of the available evidence;

e. Defendant NYU insisted on pursuing an investigation against Plaintiff despite evidence, available to the University from the commencement of the Title IX Investigation, that Respondent's allegations were false and retaliatory, and made in bad faith with the intent to further harm Plaintiff;

f. Defendant NYU refused, and continues to refuse, to provide Plaintiff with reasonable interim safety measures including, but not limited to, a campus escort despite due demand;

g. Defendant NYU failed to dismiss the spurious allegations against Plaintiff even after evidence gathered during the investigation demonstrated the falsity of the allegations; and

h. Defendant NYU failed to take disciplinary action against Respondent for his bad faith submission of false and/or misleading facts as part of his cross-claim despite evidence demonstrating Respondent's actions were taken to mislead investigators and cause harm to Plaintiff.

## II. Respondent's Theft, Possession, and Use of the Tactical Knife

### a. Defendant NYU's Code of Conduct and Weapons Policy

234. At the time of the Title IX investigation and continuing to date, Defendant NYU maintained the Weapons Policy which, in relevant part, "prohibits the use or possession of any weapon or simulated weapon by any person (i) in and/or around any and all NYU facilities (whether academic, residential, or other) that are owned, leased, or controlled by NYU, regardless of whether the bearer or possessor is licensed to carry that weapon and (ii) at any NYU-sponsored

activity or event, whether in an NYU facility or a non-NYU facility, including any participant or attendee."

235. Upon notice of a potential violation of the Weapons Policy, Defendant NYU is required to investigate the conduct pursuant to the University's Code of Conduct and its procedures.

236. Such investigation should include, upon information and belief, (i) an initial assessment by the Office of Student Conduct; (ii) notice of the allegations and participation in a conduct conference; (iii) evidence gathering by the assigned administrator; and (iv) if a violation has been committed, appropriate determination and sanctioning.

**b. Defendant NYU's Breaches of the Code of Conduct and Weapons Policy**

237. During the pendency of the Title IX investigation and thereafter, Plaintiff credibly reported that Respondent had stolen, maintained possession of on campus, and used as a threat of violence a tactical knife.

238. Rather than investigate this flagrant violation of the Weapons Policy, Defendant NYU chose to engage in revisionist history and credited Respondent's demonstrably false narrative that he owned the weapon. Defendant NYU further refused to address, at all, Respondent's continuing possession of the weapon on campus or Respondent's violent, dangerous, and threatening use of the weapon against Plaintiff.

239. During the Title IX proceedings and thereafter, Plaintiff, on her own and by and through her counsel, repeatedly asked Defendant NYU to initiate an investigation into Respondent's possession of the knife.

240. Indeed, as recently as July 2025, Plaintiff's counsel specifically asked for an investigation into Respondent's violation of the Weapons Policy, which request was acknowledged by Defendant NYU's counsel.

241. Upon information and belief, Defendant NYU has taken no steps to investigate Respondent's violation of the Weapons Policy as required under the Code of Conduct.

242. Upon information and belief, Respondent continues to be in possession of the weapon on campus.

243. As a result, Plaintiff continues to live in fear as Defendant NYU permits Respondent to maintain possession of a deadly weapon which the University is well aware has been used by Respondent previously to threaten and sexually manipulate and exploit Plaintiff.

244. As a direct and proximate result of the above unlawful conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation, loss of career opportunities, past and future economic injuries, financial damages, damages for deprivations of fair process, loss of educational opportunities, and other direct and consequential damages.

245. As a result of the foregoing breaches of Defendant NYU's various policies and procedures, Plaintiff is entitled to a judgment against Defendant NYU for breach of contract, awarding Plaintiff damages in an amount to be determined at trial, including without limitation, damages to physical well-being, damages to reputation, plus attorneys' fees.

**COUNT IV**
**Breach of Contract/Common Law: Denial of Basic Fairness**

246. Plaintiff realleges and incorporates by reference the factual allegations contained herein.

247. Defendant NYU had a duty, under an express or implied contract or as a matter of

common law, to ensure that the proceedings against Plaintiff were conducted in good faith and with basic fairness.

248. As set forth herein and above, Defendant NYU breached this duty of good faith and basic fairness by, among other things, breaching its promises and representations to Plaintiff throughout the pendency of the Title IX investigation and thereafter, to the direct benefit of Respondent, thereby causing damages to Plaintiff.

249. Defendant NYU's breach of the duty to ensure basic fairness proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

250. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial.

**COUNT V**
**Violation of New York City Administrative Code § 8-107**
**New York City Human Rights Law**

251. Plaintiff realleges and incorporates by reference the factual allegations contained herein.

252. Plaintiff is a female student at New York University.

253. Administrative Code § 8-107(4) prohibits any educational institution from discriminating on the basis of sex. *See Annabi v. New York Univ.*, 2024 U.S. Dist. LEXIS 169857, at *26 (S.D.N.Y. Sept. 20, 2024).

254. Discrimination under the City Human Rights Law includes any difference in treatment that "adversely affect[s] an individual's ability to participate fully in the terms, conditions or privileges of an educational program," and must be construed liberally to effectuate

its broad remedial purpose. *Cianciotto on behalf of D.S. v. N.Y.C. Dep't of Educ*., 600 F. Supp. 3d 434, 446–47 (S.D.N.Y. 2022); *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 109 (1991).

255. As set forth herein and above, Defendant NYU treated Plaintiff less well than her male counterpart, Respondent, throughout and following the conclusion of the Title IX investigatory process.

256. Defendant NYU's deliberate minimization of Plaintiff's sexual-misconduct complaints, its enforcement of a mutual no-contact order that restrained Plaintiff more severely than her alleged harasser without justification, and its advancement of retaliatory cross-complaints against Plaintiff despite evidence of their falsity constitute both adverse treatment and retaliation on the basis of sex. *Lees v. Graduate Ctr., CUNY*, 2016 WL 9649914, at *4-5 (S.D.N.Y. Dec. 21, 2016).

257. Furthermore, Defendant NYU's deliberate minimization of Respondent's possession of a stolen tactical blade knife as being "found" or "acquired" throughout the investigation and official reports, despite Respondent's admissions of threat and self-description as "dangerous," knowingly left Plaintiff's physical, emotional, and mental well-being in danger.

258. Defendant NYU's actions violate Administrative Code §§ 8-107(4) and (7).

259. As a direct and proximate result of the above conduct, Plaintiff has sustained tremendous damages in an amount to be determined at trial, including without limitation, loss of career opportunities, past and future economic injuries, financial damages, damages for deprivations of fair process, loss of educational opportunities, and other direct and consequential damages.

260. As a result of the foregoing, Plaintiff is entitled to a judgment against Defendant NYU, awarding Plaintiff damages in an amount to be determined at trial, including without limitation, damages to physical well-being, damages to reputation, plus attorneys' fees.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff seeks a judgment against Defendant NYU as follows:

(i) A judgment against Defendant NYU declaring that the practices complained of herein are unlawful and in violation of the aforementioned Federal and State laws;

(ii) Preliminary and permanent injunctions against Defendant NYU and its officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with Defendant NYU, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

(iii) An order restraining Defendant NYU from any retaliation against Plaintiff for participation in any form in this litigation;

(iv) All compensatory damages that Plaintiff has sustained as a result of Defendant NYU's unlawful conduct, including, but not limited to, reimbursement of Plaintiff's tuition costs and expenses, damages to compensate Plaintiff for harm to her professional and personal reputation and loss of career opportunities, emotional distress damages, and any other out-of-pocket losses that Plaintiff has incurred or will incur;

(v) Punitive and/or exemplary damages against Defendant NYU;

(vi) Statutory pre- and post-judgment interest on all sums awarded, where available;

(vii) An award of costs and attorneys' fees; and

(viii) Any other relief the Court finds just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues.

**Dated:** **New York, New York**
**October 30, 2026**

**NESENOFF & MILTENBERG, LLP**

***/s/ Andrew T. Miltenberg***

**Andrew T. Miltenberg**
**Gabrielle M. Vinci**
**363 Seventh Avenue, 5th Floor**
**New York, New York 10001**
**(212) 736-4500**
**amiltenberg@nmllplaw.com**
**gvinci@nmllplaw.com**

***Counsel for Plaintiff Jane Doe***